IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| LONNIE COLEMAN, | )<br>)<br>) |
| Plaintiff, | )<br>)  Case No: 06 C 2280<br>) |
| v. | )  Magistrate Judge Cole<br>) |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | )<br>)<br>) |
| Defendant. | )<br>) |

## MEMORANDUM OPINION AND ORDER

Lonnie Coleman, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2); 1382c(a)(3). Mr. Coleman asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying Mr. Coleman's applications.

### I.

### PROCEDURAL HISTORY

Mr. Coleman applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on May 13, 2003, alleging that he had been disabled since May 3, 2002, due to epilepsy. (Administrative Record ("R.") at 77-86). His application was denied at both the initial level of administrative review (R. 17-19), and upon reconsideration. (R. 26-27). Mr. Coleman continued pursuit of his claim by filing a timely request for hearing on September 8, 2003. (R. 30). An administrative law judge

("ALJ") conducted two hearings – on February 15, 2005, and on July 1, 2005 – at which Mr. Coleman, unrepresented by counsel, appeared and testified. (R. 168-185; 186-205). At the first hearing, Dr. Lawrence Perlman testified as a medical expert (R. 168); Dr. McKenna performed that service at the second hearing. (R. 186). In a decision dated August 5, 2005, the ALJ found that Mr. Coleman was not disabled because he retained the ability to perform a wide range of work at all exertional levels. (R.10-16). This became the final decision of the Commissioner when the Appeals Council denied Mr. Coleman's request for review of the decision on January 9, 2006. (R. 2-4). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Coleman has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). Because the ALJ made no mention of the initial hearing in his decision, thereby ignoring medical expert testimony that Mr. Coleman is disabled, this case must be remanded to the Commissioner.

## II.

## EVIDENCE OF RECORD

Mr. Coleman was born on January 23, 1961, making him forty-four years old at the time of the ALJ's decision. (R. 64). He has suffered from seizures since the age of thirteen. (R. 172). Mr. Coleman has a high school education (R. 91), and the bulk of his work experience has been as a parking lot attendant. From 1986 until 1999, he worked at a lot where he issued tickets and moved cars. (R. 116). Although he had a number of seizures on that job, his employer liked him and accommodated him. (R. 173). But when they had a falling out, he lost his job. (R. 175). After that, he was unable to find

other work due to his seizures and the medication he had to take to control them. (R. 175).

## A.
## The Medical Evidence

The medical evidence is somewhat sparse, but references a long history of a seizure disorder. More recent records indicate that, in May of 2002, Mr. Coleman was hospitalized at St. Francis Hospital for two days after suffering a generalized tonic-clonic seizure. (R. 137-143). In a tonic-clonic seizure, the person loses consciousness, the body stiffens, and then he falls to the ground. This is followed by jerking movements. After a minute or two, the jerking movements usually stop and consciousness slowly returns. http://www.epilepsy.com/epilepsy/seizure_tonicclonic.html. Mr. Coleman's episode was witnessed by his girlfriend, who took him to the emergency room. (R. 138).

The attending physician noted that Mr. Coleman had a history of seizures, but had been seizure-free for some time before this incident, and had stopped taking medication. (R. 137-138). Mr. Coleman was given Ativan and Tegretol – the medication he was on previously – and discharged. (R. 138). As he was waiting for his ride home in the emergency room, however, he suffered another tonic-clonic seizure and was admitted for treatment. (R. 138). He was prescribed 200 milligrams of Tegretol twice daily, instructed not to drive, and told to follow up with his neurologist. (R. 137).

On April 4, 2003, Mr. Coleman was taken to the emergency room of Holy Cross Hospital after experiencing a grand-mal seizure in his home. (R. at 151-162). He was noted to have slight confusion at the time. (R. 159). Laboratory tests showed only trace levels of Tegretol, which did not fall in the expected therapeutic range (Tr. 154, 156). Mr. Coleman admitted that he had not taken his medication recently. (R. at 161). He was

given refills for his Ativan and Tegretol, and his Tegretol prescription was increased to three 200-milligram doses daily. (R. 151).

On June 3, 2003, Dr. Robert G. England, a state agency physician, reviewed the medical evidence and concluded that, due to his impairment, Mr. Coleman should avoid concentrated exposure to hazards such as machinery and heights (Tr. 117-124). Dr. England noted that laboratory tests had indicated noncompliance with medication. (Tr. 124). Another state agency physician, Dr. Frank Jimenez, reviewed the evidence on August 6, 2003, and signed off on Dr. England's opinion. (Tr. 124).

On June 18, 2003, Dr. B. Marwah, Mr. Coleman's treating physician since 1992, completed an Epilepsy Report to the Bureau of Disability Determination Services. (R. 163-64). The doctor noted that Mr. Coleman suffered from grand-mal seizures, and that he monitored him on a monthly basis, most recently on June 18, 2003. (R. 164). Dr. Marwah reported that Mr. Coleman was now taking his Tegretol medication as prescribed, and suffered drowsiness as a result. (R. 164). He added that Mr. Coleman was unable to afford some of the laboratory testing that the Epilepsy Report requested. (R. 164). About three months later, in September 2003, Dr. Marwah added that, because of the drowsiness secondary to his seizure medication, Mr. Coleman was unable to work. (R. 166).

Mr. Coleman continued under Dr. Marwah's care and, on February 7, 2005, the doctor reiterated that Mr. Coleman suffered from long-standing epilepsy. (R. 167). He stated that the dosage of Tegretol that Mr. Coleman required made him too drowsy to work. (R. 167). Dr. Marwah explained that "it would be unsafe to decrease the dosage or discontinue the medication." (R. 167).

4

## B.
## The Two Administrative Hearings

On February 15, 2005, Mr. Coleman appeared, unrepresented by counsel, for his first administrative hearing. He testified as to his approximately thirty-year history of a seizure disorder and the accommodations his employer made for him in his parking lot job. (R. 172-173). For example, Mr. Coleman stated that he had numerous seizures on the job due to a change in medication from Dilantin to Tegretol when it was discovered that the former caused him liver problems. Nevertheless, his employer allowed him to continue work, at least until they fell on bad terms, and Mr. Coleman was fired. (R. 173-75).

Mr. Coleman was unable to find a job after that due to his epilepsy and his medication. (R. 175). He gave examples of being unable to pass physicals for the Chicago Transit Authority and the Pacific Railroad. (R. 175). He admitted that he failed to take his medication at various times in the past, attributing these lapses to stress and the negative side effects that the medications caused. (R. 176). He testified that he currently takes a 600 mg. daily dosage of the medication so that he will not have any more seizures, but that the medication makes him sleepy and irritable. (R. 179). He had to guard against having accidents, even around his home. (R. 179).

Mr. Coleman doubted he would ever be able to find another employer as lenient with his problem as the parking lot had been. (R. 180). After confirming that Mr. Coleman had taken his medication that day, the ALJ asked Mr. Coleman whether there was any medical evidence regarding the alleged side effects from his medication, such as a statement from his doctor supporting his testimony that "the Tegretol controls the seizures but puts you to sleep." (R. 179, 181). Mr. Coleman responded that he had

brought just such a statement from his physician and gave it to the ALJ. (R. 181-82). It was apparently the February 5th note from Dr. Marwah, and had already been made a part of the record. (R. 181-82). Curiously, given his questioning as to whether there was any such evidence, the ALJ said he had already seen it. (R. 182).

Next, the ALJ questioned the medical expert, Dr. Perlman, as to whether he agreed with the treating physician's statement that it would be unsafe to decrease the dosage, and that the side effects of the medication prevented him from working. (R. 182). Dr. Perlman testified that the medical documentation clearly established that Mr. Coleman has epilepsy, the treatment of which requires large doses of Tegretol. (R. 183). Dr. Perlman explained that "unfortunately to control the seizure you have to have large doses of medication which are sedative in nature. . . . So he's drowsy. Sleep. Can't function. It's not uncommon . . . ." (R. 183). The ALJ then pressed the medical expert, noting that Mr. Coleman did not seem drowsy, that he could not recall a similar case, and that perhaps Mr. Coleman's doctor simply gave him a statement so he could get disability. (R. 184). Dr. Perlman responded this way:

> I think there's no question the claimant does have epilepsy, sir. And the only way it's controlled is by the use of this medication and the side effects of that medication are such that he cannot function.

(R. 184). The ALJ then excused Mr. Coleman and ended the hearing.

Without explanation or any apparent justification, the ALJ scheduled a second hearing for Mr. Coleman on July 1, 2005. (R. 47-50). Once again, Mr. Coleman appeared and testified, unrepresented by counsel,[1] but this time, a different medical

---

[1] Mr. Coleman does not raise the issue of the validity of his waiver of attorney representation. The ALJ clearly did not inform Mr. Coleman of his right to an attorney in the manner required under applicable case law. *See Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). At the initial hearing,
(continued...)

expert testified: Dr. McKenna. (R. 186). The ALJ took Mr. Coleman through much the same testimony as the previous hearing, albeit with some additional exchanges. (R. 189-200). At one point, the ALJ engaged Mr. Coleman in a discussion about his application with the Chicago Transit Authority:

> Mr. Coleman: Well, I tried to find employment. I tried CTA. I tried a number of railroad companies, you know. I passed the test for CTA and when it came down to the physical, they told me that they wasn't going to be able to hire me because I was epileptic.
>
> ALJ: How did they know that?
>
> Mr. Coleman: Well, they asked me if I had any medical problems or taking - any medical problem or had medication or whatever and I told them, yeah, I was epileptic.
>
> ALJ: Well, that was a good way not to get the job, wasn't it?

(R. 191).

Dr. McKenna testified that Mr. Coleman clearly had a seizure disorder and would need to avoid working around heights and moving machinery. (R. 202). There would be restrictions regarding driving. (R. 202). Dr. McKenna felt that:

> there are probably a lot of jobs in the economy that he could do and be honest about the fact he has a seizure disorder. I think people, you know, would – he could fit in, still erode the shortage of people in certain fields [sic].

(R. 202). As for the side effects of the Tegretol, Dr. McKenna reasoned that because Mr. Coleman had been able to work despite them at the parking lot, he would be able to do so at another job. (R. 202-03). He also felt that "damage to your blood with severe anemia" was a more serious side effect from Tegretol than drowsiness. (R. 203).

---

¹(...continued)
however, Mr. Coleman indicated that he had signed a waiver and sent it to the Office of Hearings and Appeals. (R. 172).

7

# III.

## THE ALJ'S DECISION

The ALJ found that Mr. Coleman had not engaged in substantial gainful activity since the alleged onset of his disability in May of 2002. (R. 14). He recounted the documentary medical evidence, including Mr. Coleman's trips to the hospital for treatment and his treating physician's opinion that he was unable to work. (R. 12). The ALJ determined that Mr. Coleman's epilepsy was a severe impairment, but that it did not meet or equal an impairment listed in the Agency's regulations as disabling. (R. 12, 15). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ then assessed plaintiff's residual functional capacity ("RFC"). In so doing, the ALJ noted that Mr. Coleman had not always been compliant with his medication, which seemed to control his seizure when he took it as prescribed. (R. 12-13). He found Mr. Coleman "generally not credible in light of his admitted non-compliance with medication as prescribed and no treating source detail of treatment." (R. 13). The ALJ also noted that "the medical expert says there is nothing to prevent the claimant's working." (R. 13). As such, the ALJ concluded that Mr. Coleman had no exertional limitations on his ability to work, and was restricted only insofar as he could not work around heights or moving machinery. (R. 13). This precluded a return to his former work as a parking lot attendant but, employing the Medical Vocational Guidelines as a framework for decision-making, the ALJ concluded that it did not prevent Mr. Coleman from performing other work. (R. 13-14). Accordingly, the ALJ found that Mr. Coleman was not disabled and was not entitled to DIB or SSI under the Act. (R. 14-16).

The ALJ made no reference at all to the initial administrative hearing (R. 10), and no mention of the testimony of Dr. Perlman.

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, "deference is not obeisance," *Rogers v. Barnhart*, 446 F.Supp.2d 828, 833 (N.D.Ill. 2006), and a reviewing court is not a "rubber stamp" for the Commissioner. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for his decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge

from [the] evidence to [the] conclusion." *Id.* Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.
### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

This is a tale of two hearings. In the first, a medical expert testified that Mr. Coleman cannot work. In the second, another doctor opined he could. Why the second hearing was held, the ALJ never explained. Holding two administrative hearings is not particularly common, unless new evidence comes to light or it becomes apparent that a medical or vocational expert's testimony would be useful. *See* 20 C.F.R. §§ 404.936; 416.1436 (". . . the administrative law judge may adjourn or postpone the hearing or reopen it to receive additional evidence any time before he or she notifies you of a hearing decision."). Neither was the case here. Not only was there is no reason given for the necessity of a second hearing, no reason is apparent.

The only reason that can be fathomed is that the ALJ was not happy with the record with which he was presented at the end of the first hearing. The ALJ's view of Mr. Coleman and his case during that hearing was all too apparent, as evidenced by his exchange with Dr. Perlman in which he asked tendentiously, whether Mr. Coleman's doctor had perhaps simply given him a statement so he could get disability. (R. 184). When Dr. Perlman refused to support the ALJ's speculation, the ALJ then excused Mr. Coleman and ended the hearing. *Id.*

In short, one is left with the impression that the ALJ was perhaps unhappy with the result of the first hearing, and took steps to alter it by convening a second. Although disturbing, it is merely an impression, and it would be as improper to make judgments on that impression as it was for the ALJ to convene a second hearing without some explanation and to make a credibility determination that was at once illogical and inconsistent with the guiding Social Security Rulings. The ALJ's failure even to mention

the first hearing and Dr. Perlman's opinion that Mr. Coleman was disabled requires remand. Thus, it is not enough that the ALJ concluded that "[t]he medical expert says there is nothing to prevent the claimant's working." (R. 13). That conclusion cannot coexist with Dr. Perlman's contrary opinion, without some explanation of why his is entitled to no weight and Dr. McKenna's was entitled to the weight of an encyclical.

An ALJ cannot ignore an entire line of evidence that is contrary to his ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). He may not simply pick and choose among the various pieces of evidence and discuss only those that support his conclusion. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 788-89 (7th Cir. 1997); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). "Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir.1986). Here, the ALJ's decision would lead one to believe that the first hearing never took place. By ignoring the first hearing, the ALJ ignored Dr. Perlman's opinion that Mr. Coleman was disabled. He did not mention it, did not discuss it, and did not explain why he was ignoring it.

Consequently, it is impossible for a reviewing court to say whether the decision rests on substantial evidence. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir.2000). As the Commissioner concedes, an ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). The Seventh Circuit has called this "building a logical bridge" from the evidence to the conclusion.

12

*Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007); *Rogers*, 446 F.Supp.2d at 833.

This requirement is dictated in the final analysis by recognition that the validity and moral authority of any conclusion largely depends on the mode by which it was reached. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171 (1951)(Frankfurter, J., concurring). Cf., Henry M. Hart, Jr., *Foreword: The Time Chart Of The Justices*, 73 Harv.L.Rev. 84, 98-99 (1959)("In the end, however, *ipse dixits* are futile as instruments for the exercise of 'the judicial Power of the United States.' "). Requiring Administrative Law Judges to explain the reasoning that led to and supports a particular conclusion is neither unique to ALJs nor does it impose some heightened obligation on them. The principle governs decision-making at all levels of the federal judiciary as well. *See, Rogers v. Barnhart*, 446 F.Supp. 2d 828, 833 (N.D. Ill. 2006)(collecting cases).

The Commissioner advances a couple of reasons why the ALJ *might* have rejected Dr. Perlman's opinion. The Commissioner says that the doctor's opinion was "conclusory" and was "inconsistent with the overall evidence in the record." (*Defendant's Response to Plaintiff's Brief*, at 11). But these are not the ALJ's reasons for having disregarded Dr. Perlman's opinion. The Commissioner has substituted his speculative, impermissible guess for the ALJ's required, non-speculative analysis in contravention of the prohibition against the Commissioner's lawyers advancing grounds in support of the agency's decision that were not given by the ALJ. *Golembiewski*, 322 F.3d at 916; *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Were the rule otherwise, the Act's careful allocation of responsibilities between the ALJ and Commissioner would vanish.

13

Even if it were permissible to analyze the Commissioner's partisan guess on its intrinsic merit, the Commissioner's position is unconvincing. Dr. Perlman's opinion was no more conclusory than those of Dr. McKenna and the State Agency physicians, who all issued brief opinions. Indeed, one State Agency physician simply signed the opinion of the first; nothing is more conclusory than that. Their opinions, like Dr. Perlman's opinion, were not based on examinations of Mr. Coleman or a long history of treatment. That is certainly not to say they are somehow without merit. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir.2004); 20 C.F.R. §§ 404.1527(d), 416.927(d). But simply to criticize Dr. Perlman's opinion as conclusory does not provide a reasoned basis for preferring the conclusions of the doctors in the second hearing. Moreover, if that were truly the reason for discounting Dr. Perlman's testimony, it is unlikely that the ALJ would not have said so. The only discernible difference appears to be that, unlike Dr. Perlman, Dr. McKenna and the State Agency physicians said Mr. Coleman could work. But that is not a reason – at least not a principled one authorized by the Social Security Rulings – simply to ignore Dr. Perlman and, *without explanation,* opt for the testimony offered at the second hearing.

Furthermore, analysis of Dr. McKenna's testimony calls his opinion into at least some question. He was impressed with the fact that Mr. Coleman had been able to perform his parking lot attendant job despite his impairment and the side effects from medication. (R. 202-03). It is unclear, however, whether the doctor took into account the fact that Mr. Coleman's employer made special allowances for him, which Mr. Coleman said no one else would do. The Seventh Circuit has emphasized that, in such instances,

employment is not necessarily proof of an ability to work. *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir.1998)(Posner, C.J.). "One can be unemployable, yet employed." *Id.*

Dr. Perlman's opinion may have been inconsistent with the opinions of Dr. McKenna and the State Agency physicians, but it was consistent with the opinion of Mr. Coleman's treating physician, Dr. Marwah. The State Agency physicians weighed in before there was any report from Dr. Marwah. True, the ALJ discounted Dr. Marwah's opinion, explaining that there was no record that Mr. Coleman's seizures continued to occur despite prescribed therapy. (R. 12). But that was not really the question. It was whether the debilitating side effects of the substantial dosage of medication that no one disputed was essential to control Mr. Coleman's epilepsy, prevented him from working.

Dr. McKenna's opinion that there were "probably" a lot of jobs that Mr. Coleman could perform is not only conclusory and speculative, it would appear to come close to going beyond his medical expertise and into that of a vocational expert, which Dr. McKenna conceded he was not. (R202).

Even if one were to ignore all this, one cannot ignore the fact that the claimed conclusory nature of Dr. Marwah's opinion and its supposed inconsistency with other evidence were not discussed by the ALJ; they were posited for the first time by the Commissioner in his brief. That will not do. The ALJ failed to address substantial evidence that was contrary to his conclusion – indeed, he proceeded as though the initial hearing that he had convened never occurred. As a result, this case must be remanded to the Commissioner for further proceedings. There is one further point that merits discussion, namely the ALJ's credibility findings.

At one point in the second hearing, the ALJ made clear through his rhetorical question that he was of the view that Mr. Coleman's truthful response to the CTA's question whether he had any medical conditions and was on medication was a clever and effective way not to get the job. *See supra* at 7. Perhaps the ALJ was right. Perhaps not. It is not for a reviewing court to say. It is for the ALJ to make credibility determinations, which must be properly supported. Under SSR96-7P, the ALJ's determination or decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). It is not sufficient for the ALJ to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the ALJ simply to recite the factors that are described in the regulations for evaluating symptoms. *Zurawski*, 245 F.3d at 887.

The ALJ's implicit credibility finding based on Mr. Coleman's truthful response to a question by the CTA is contrary to these requirements. Under the ALJ's mode of analysis, Mr. Coleman could not win. Had he answered the CTA's question untruthfully, the ALJ would no doubt have concluded that his past lies affected his present credibility–which would have been a permissible conclusion. *Cf. Rogers*, 446 F.Supp. 2d at 851, n.22. But it is difficult to see how a truthful response to the CTA's questions justifies a negative, present-credibility finding. Indeed, it seems inherently contradictory to say that telling the truth is an indication of lack of credibility. But that is exactly what

the ALJ found. This "heads I win, tails you lose" approach is not merely a curious method of assessing credibility, it is an impermissible one.[2]

The ALJ's further conclusion that Mr. Coleman was "*generally* not credible in light of his admitted non-compliance with medication as prescribed and no treating source detail of treatment," (R. 13)(emphasis supplied), is contrary to SSR96-7P. That ruling provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide...." This should include whether "the individual may not take prescription medication because the side effects are less tolerable than the symptoms." (1996 WL 374186, at *7 - 8: Social Security Ruling, Policy Interpretation Ruling, Titles II and XVI: Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements).

The ALJ never considered Mr. Coleman's explanation – or at least he did not say he did – which was supported by medical testimony, that there are significant side effects from the drug regimen that he was required to comply with in order to palliate his epilepsy. Thus, the ALJ's conclusion that the Mr. Coleman was not a credible witness "generally" simply because of his admitted non-compliance with his prescription schedule, is inconsistent with SSR96-7P. Of course, if there were other evidence properly bearing upon Mr. Coleman's credibility, the ALJ would have been entitled to discount the testimony regarding the reasons for Mr. Coleman's non-compliance. In that event, non-compliance would have the effect on credibility postulated by SSR96-7P, and

---

[2] The record demonstrates that Mr. Coleman had been truthful not only with the CTA but with doctors and emergency room personnel regarding his non-compliance with his prescription regimen.

indeed, might have justified a denial of benefits for failure to have followed a prescribed course of medical treatment without good cause. *Cf., Rogers*, 446 F.Supp.2d at 834. But there was no such evidence – at least none adverted to by the ALJ.[3]

A court must afford an ALJ's credibility finding "considerable deference," and overturn it only if "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006); *Rogers*, 446 F.Supp.2d at 852 (collecting cases). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006). That is the case here. This is not to say that the ALJ's unfavorable assessment of Mr. Coleman's credibility might not be correct. It is only to say that the articulated factors that led him to that conclusion cannot stand under well-accepted principles of review.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for reversal and remand of the Commissioner's decision [#31] is GRANTED. The Commissioner's motion to affirm the decision [#33] is DENIED. This case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 8/3/07

---

[3] The ALJ's reference to "no treating source detail of treatment" is drawn from SSR 87-6. (R. 13). While that ruling covers the evaluation of disability claims due to epilepsy, its focuses on documentation necessary to establish whether a claimant's impairment meets the listings, and claims of continuing seizure activity despite medication. The issue here is the ability to work despite the side effects of prescribed medication.